ESTATE OF MILTON FELDMAR, DECEASED, GARY FELDMAR AND DOROTHY FELDMAR, CO-EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Feldmar v. Commissioner
Docket No. 7694-86.
United States Tax Court
T.C. Memo 1988-429; 1988 Tax Ct. Memo LEXIS 456; 56 T.C.M. (CCH) 118; T.C.M. (RIA) 88429; September 12, 1988. Rex A. Guest and Francis Grossi, for the petitioners. Judith Picken and James S. Stanis, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency of $ 9,649,113.69 in the estate tax due from the Estate of Milton Feldmar. After concessions, the sole issue for decision is the date of death fair market value of 767,800 shares of United Equitable Corporation common stock owned by Milton Feldmar at his death. *457 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, the addendum to the stipulation of facts, and attached exhibits are incorporated herein by this reference. Petitioner is the Estate of Milton Feldmar. On March 30, 1982, Milton Feldmar (the decedent) died unexpectedly. At the time of his death, decedent's domicile was Northfield, Illinois. The co-executors of petitioner are Gary Feldmar and Dorothy Feldmar. Gary Feldmar resided in Lincolnshire, Illinois, and Dorothy Feldmar resided in Highland Park, Illinois, at the time the petition in this case was filed. Petitioner's Federal estate tax return was timely filed. The alternate valuation date was not elected. Included with the estate were 767,800 shares of common stock in United Equitable Corporation (UEC). Petitioner's return listed the value of this stock as $ 7,678,000, or $ 10 per share. In his notice of deficiency, respondent determined that the fair market value of the UEC stock in the state should be $ 35,776,524, or $ 46.60 per share. Nature of UEC's Business
At the time of decedent's death, UEC was an Illinois-based holding company which, through *458 the companies it owned, was in the business of selling and underwriting several different types of insurance coverage. The companies UEC owned, directly or indirectly, were, among others, as follows: (1) United Equitable Life Insurance Company (UELIC) and its wholly owned subsidiary, United Equitable Insurance Company (UELIC), both of which UEC acquired in 1972; (2) American Warranty Corporation (AWC), acquired by UEC in December 1976; and, (3) Action Associates (Action), acquired by UEC in July, 1980. The types of insurance coverage UEC's family of companies sold and underwrote included the traditional forms of insurance: life, and individual and family accident and health. In addition, the companies UEC owned were also involved in marketing and administering two specialty forms of insurance products: vehicle warranty/service contracts, and collateral protection services. The vehicle warranty/service contract business (hereinafter referred to as warranty services) conducted by AWC involves the marketing of such contracts to factory-authorized new car dealerships. The car dealerships in turn sell the warranty contracts to buyers of both new and used cars, and thus provide such *459 buyers a warranty against power train mechanical breakdowns. When a car buyer purchases the contract from a dealer, the buyer is buying a warranty. When a dealer purchases the contract from AWC, the dealer is basically purchasing insurance against the liability they will incur in satisfying the terms of the warranty they have given the car buyer. The collateral protection services of UEC are marketed and administered by Action. Action is a Los Angeles, California, based insurance broker that provides collateral protection services to financial institutions engaged in consumer lending. In the performance of its services, Action manages a client's consumer loan portfolio by ensuring that the collateral securing each loan is insured in an amount at least equal to the outstanding loan balance. Underinsured collateral is insured by Action through a third-party underwriter, and Action is compensated for its services in the form of a commission. Through the early 1970s, UEC's major emphasis was on low cost limited indemnity accident and health policies. After UEC's acquisition of AWC in 1976, and of Action in 1980, however, UEC's revenue mix shifted away from such accident and health *460 policies to an emphasis on the warranty services and collateral protection services. Of UEC's 1981 consolidated revenue, 57% consisted of warranty and collateral protection services income, and 40% consisted of accident and health and life insurance income. The remaining 3% came from UEC's corporate investment portfolio. By comparison, in 1977 62% of UC's revenue came from accident and health insurance sales. Economic Trends Facing UEC Accident and Health Insurance. Historically, UEC had specialized in the sale of individual and family accident and health insurance. This line of UEC's business was a major source of UEC's total earning power at the time of decedent's death. UEC's accident and health insurance policies were, as of the date of decedent's death, marketed through the use of direct mail solicitations (hereinafter referred to as direct response marketing), and through the use of agents, UEC's own or agents which operated independently thereof (hereinafter referred to as agency marketing). In prior periods, UEC's concentration was upon the direct response form of marketing; such direct response marketing techniques were considered to be the core of UEC's business. *461 In 1976, approximately 71% of UEC's accident and health premiums resulted from direct response marketing, and approximately 29% came from agency marketing. In contrast, in 1981 approximately 54% of UEC's written premiums for UEC's accident and health insurance resulted from direct response marketing, and 46% from agency marketing. With respect to UEC's accident and health insurance first year premium income trends, i.e., premium income on newly sold policies, direct response marketing was, as of decedent's date of death, increasingly less successful. To counter this increasing ineffectiveness, UEC developed and began marketing, in 1979, an add-on policy which provided to existing accident and health policy holders additional protection. Such add-on policies were also sold through a direct response marketing program. Even considering such add-on policies as additional first year premiums, however, UEC's total first year premiums from direct response marketing continued to decline after 1979. [1] Total direct response marketing first year premiums declined, in relation to the prior year's premiums, by 35.8% in 1980 and by 46.6% in 1981. Exclusive on the add-on policy premiums, *462 accident and health insurance first year premium income from direct response marketing fell by 84.9% between 1980 and 1981. The most important reason for such a precipitous decline in sales from direct response marketing was because UEC has not been able to develope a successful direct response marketing campaign since 1979. UEC did continuously test newly developed direct response marketing programs during 1980 and 1981. However, the marketing test results were unsatisfactory. Specifically, the marketing test results indicated that the expected amount of net new policy sales from the proposed new direct response marketing programs would not be large enough to justify the initial costs UEC would have to incur in implementing such new direct response marketing *463 program. Another reason for the decline in UEC's sales of accident and health policies through direct response marketing in 1980 and 1981 was the intense competition UEC faced in the industry. In the years preceding the date of decedent's death, competition in the industry was intensifying and regulatory constraints were increasing. These influences, increasing competition and regulatory concerns, caused the sellers of accident and health insurance to provide to the consumer more complete disclosure of policy benefits and the seller's related costs. Because of this, UEC's policies appeared less attractive to the consumer than did the policies of UEC's competitors. Although the direct response marketing's successive failures were somewhat offset by steady growth in the sales produced by agency marketing, such offset was not without its costs. In order to give the agents a product which would sell, and which would enable the agent to make a livelihood selling, UEC was required to develop a product costing a larger premium but offering additional coverage for nursing home or extended care costs. Inherent in such policy coverage was greater potential risks to the policies' underwriter, *464 UEIC. The costs incurred by UEC in selling its accident and health policies, by direct response or agency marketing, were capitalized by UEC as an asset labeled "deferred policy acquisition costs." That asset, i.e., the cost of newly acquired policies, is amortized by UEC over the expected life of those policies. The "deferred policy acquisition costs" asset is the second largest of all assets on the corporate balance sheet and represents approximately 24.8% of UEC's total assets as of December 31, 1981. Moreover, in relation to the total stock outstanding, deferred policy acquisition costs represented $ 23.21 per share as of December 31, 1981. Life Insurance. UEC began emphasizing its life insurance sales in 1980. Prior to that time, earned insurance premium income was less than $50,000 a year. In 1981, earned insurance premium income from UEC's life insurance sales increased to approximately $ 1,700,000. The profitability of this product line was negatively affected, however, by the costs UEC incurred in connection with making the initial sales of the policies. The costs so incurred are those associated with selling a new policy and are recurring expenses so long as *465 UEC remains in the life insurance business. For example, part of a policy's acquisition costs consists of the commission paid an agent for the sale of that policy. Generally, UEC expects to recoup such deferred policy acquisition costs as premiums on the life insurance policy are paid in future years. If a policyholder allows a policy to lapse, however, the initial costs incurred by UEC are never recovered and UEC's profitability suffers. UEC's experience with respect to the lapse rate of life insurance policies, in relation to premiums paid, [2] has been as follows: First Year
Total
Life Insurance
Life Insurance
Lapse
Year
Premiums
Premiums
Rate
1978
$     13,000
$     36,000
1.2%
1979
10,000
45,000
3.5 1980
1,223,000
1,351,000
22.7 1981
1,003,000
2,016,000
33.4 Vehicle Warranty/Service Contracts. There are two distinct aspects of the warranty services business which contribute to UEC's earnings. Operating revenue is first generated from the sale of the contracts to the automobile dealerships, *466 from which AWC expects to earn a profit after all expenses. Second, the pricing of the contracts includes a provision for a premium for the warranty insurance coverage provided the automobile dealership under the contract. AWC would remit such premium to UEIC, the underwriter of the warranty insurance coverage. Thus, UEC generates revenue in the form of AWC's contract sales in excess of expenses therefor, where such expenses include the premium for warranty insurance, and in the form of UEIC's premiums in excess of losses for which UEIC must reimburse the automobile dealers. UEC's experience with respect to its warranty contract sales, and its warranty insurance premiums earned, as been as follows: Warranty
Warranty
Pretax
Insurance
Contract
Earnings
Premiums
Loss
Year
Sales
(Losses)
Eaned
Ratio [3]
1979
10,984,000
120,000 9,885,000
71.3%
1980
12,330,000
(234,000 9,865,000
77.2 1981
10,293,000
(521,000)
12,143,000
78.6 *467 In 1979, AWC's contract sales represented an estimated 30% market share for new U.S. manufactured automobiles and a 5% market share for foreign manufactured automobiles. By early 1982, AWC's estimated domestic market share had declined to 5% to 10%, whereas its foreign market share had increased to an estimated 20% to 25%. Such shift in emphasis was partially in response to the shift American purchasers made from domestically produced automobiles to foreign produced automobiles. AWC's rate of growth in total contract sales slowed sharply in 1980, and declined by 16.5% in 1981. The reasons behind AWC's increasingly poor performance are multifaceted. First, new car sales steadily declined following the record results the automobile industry realized in 1978 and, therefore, the warranty contract sales made in connection therewith also declined. Second, competition in the market increased because, in an attempt to off-set the declining market, automobile manufacturers themselves started competing with AWC by offering additional warranties or warranty contracts through their respective automobile dealerships. Finally, in an attempt to stem its declining market share, AWC changed *468 its compensation program offered to major automobile dealerships. In 1979, AWC began offering such dealers a compensation plan for the sale of AWC warranty contracts, under which the dealers would be able to participate in the profits UEIC was realizing in its underwriting capacity. Such a compensation plan, however, was ineffective and was discontinued in 1981. This resulted in an additional disruption in AWC's marketing program in that year and added to UEC's decline in total contract sales. Another negative impact upon AWC's profitability in 1981 was caused in connection with its 1979 attempt to change its compensation scheme for major car dealerships. Such change in its compensation scheme required, in 1979, a major revamping of AWC's computer system. When such compensation scheme proved to be ineffective as an incentive for marketing AWC's warranty service contracts, and was terminated in 1981, AWC was required to again reprogram its computer system. Such reprogramming of computers often occurs in the insurance industry. The 1981 reprogramming had not been completed as of early 1982, and the costs associated with the reprogrammming during 1981 further decreased AWC's *469 earnings for that year. The second aspect of UEC's revenues flowing from its warranty services comes from the premium income UEIC receives upon underwriting the warranty insurance coverage incorporated into the contracts sold. UEIC's earned premiums from its underwriting activities grew gradually in the years 1979 through 1981; however, such was only in response to AWC's successful contract sales during the period 1977 through 1979. Due to the nature of insurance accounting, however, changes in earned premiums for UEIC's underwriting activities lag, by approximately two to four years, behind AWC's contract sales… Consequently, over the period from 1982 to 1984, it can be expected that UEIC's experience in earned premiums will begin to decline in response to AWC's dismal contract sales performance during the 1980 to 1981 period. Even considering the growth UEIC experienced in earned premiums from its warranty services underwriting activities in 1981, UEIC still suffered a $ 569,000 pre-tax operating loss in that year from such activities. Further, in 1981 UEIC experienced a loss ratio of 78.6% on its warranty services underwriting activities; such losses were deemed excessive. *470 To ensure that it had sufficient funds available for future claims under its warranty services' coverage, UEIC engaged an actuarial consulting service to evaluate the sufficiency of UEIC's claim reservs. Such actuarial service found that, in relation to the expectations under which UEIC originally operated in establishing its reserves, consumers were beginning to retain their automobiles for longer periods of time. Such a change in consumer habits had the potential of requiring UEIC to reimburse automobile dealers for more warranty claims than were anticipated by UEIC in establishing its claim reserves. For this reason, the actuarial service advised UEIC to increase its claims reserve by $ 2,000,000 in 1981, and to expect similar increases in subsequent years. The $ 2,000,000 adjustment UEC made to its warranty services claim reserves in 1981 negatively impacted its net income, and thus partially caused the pre-tax operating loss. Collateral Protection Services. Action's business of providing collateral protection services is closely tied to the demand for automobile loans because the majority of the loans managed by Action have automobiles as their underlying collateral. *471 For this reason, Action's revenue growth is heavily influenced by automotive industry sales, which historically have been cyclical and closely tied to the business cycle. As of early 1982, the automotive industry was, as was the whole of the United States, in the midst of a recession. Furthermore, Action was purchased by UEC in 1980 in a transaction under which UEC was required to pay, in addition to the initial purchase price of $ 1,900,000, additional contingent consideration amounting to a substantial portion of the pre-tax income of Action through 1983. The initial consideration of $ 1,900,000 was paid by UEC in 1980 and 1981. The contingent consideration earned and accrued amounted to $ 745,000 and $ 490,000 in 1981 and 1980, respectively. Of the contingent consideration so accrued and owed by UEC, $ 1,166,000 remained unpaid on December 31, 1981, and was payable at various times through June, 1985. This, together with the effect the recession was having on Action's growth rate, effectively eliminated any prospect of return to UEC from this segment of its business until 1984. UEC's Revenues and Earnings
In UEC's annual reports, the consolidated balance sheets for *472 the fiscal years ending December 31, 1979, 1980, and 1981, appeared as follows [4] (in 000's): ASSETS
1981
1980
1979
Cash
$  1,588
$  2,615
$     948
Investments
Bonds, at amortized cost
40,614
35,411
35,420
Short-term investments, at cost
3,406
6,652
1,321
Mortgage loans, at unpaid principal
896
--
--
Other
1,767
1,114
270
Total investments
46,683
43,177
37,011
Other Assets
Uncollected premiums
4,357
3,185
3,255
Uncollected commissions
1,381
1,738
--
Accrued investment income
939
852
889
Deferred policy acquisition costs
22,400
21,021
20,984
Funds held by reinsurers
576
421
--
Land and buildings, net
5,541
4,101
910
Equipment, net
2,321
1,617
1,600
Cost in excess of net assets of
purchased subsidiaries, net
2,679
1,808
622
Other
1,716
1,175
736
Total other assets
41,910
35,918
28,996
Total Assets
$ 90,181
$ 81,710
$ 66,955
*473 LIABILITIES AND SHAREHOLDERS' EQUITY
Insurance Reserves
Unearned premiums
$ 34,638
$ 25,570
$ 21,474
Claim reserves
5,082
4,348
4,376
Life reserves
606
168
96
Total insurance reserves
40,326
30,086
25,946
Other Liabilities
Premiums payable
2,727
3,200
--
Short-term notes payable to banks
2,585
2,635
1,990
Accrued expenses and other liabilities
4,170
4,489
4,804
Notes payable to former stockholders
and former owners of purchased
subsidiary
1,644
2,318
1,354
Income taxes payable - current
191
1,732
917
deferred
8,170
8,950
7,935
Funds held for reinsurers
--
37
365
Total other liabilities
19,487
23,361
17,365
Total Liabilities
59,813
53,447
43,311
Shareholders' Equity
Common stock
429
429
429
Additional paid-in capital
3,372
3,359
3,359
Rtained earnings
31,253
29,203
24,584
35,054
32,991
28,372
Less common stock in treasury,
at cost.
4,686
4,728
4,728
Total shareholders' equity
30,36y8
28,263
23,644
Total Liabilities and
Shareholders' Equity
$ 90,181
$ 81,710
$ 66,955
*474 The 1981 financial report also set forth consolidated statements of income for the same fiscal years ending December 31 (in 000's) as follows: 1981
1980
1979
Income
Insurance premiums
$ 31,110 $ 27,176 $ 24,069 Investment income (principally
interest)
5,123 3,654 2,742 Net warranty/service sales
10,293 12,330 10,984 Collateral protection commissions
3,343 1,62 -- Other
523 332 289 Total Income
50,392 45,113 38,084 Costs and Expenses
Insurance benefits
17,508 13,588 9,772 Mailing costs
1,056 1,431 4,323 Commissions
9,234 6,390 5,461 Salaries
7,402 6,199 5,094 Other administrative expenses
13,498 9,972 9,407 Policy acquisition costs - deferred
(9,734)
(7,305)
(8,721)
- amortized
8,355 7,268 6,172 Premium taxes
878 551 701 Total costs and expenses
48,197 38,094 32,209 Income before income taxes
2,195 7,019 5,875 Provision for income taxes
145 2,400 1,855 Income before realized gains
(losses) on investments
2,050 4,619 4,020 Realized gains (losses) on investments
-- -- -- Net income
$ 2,050 $ 4,619 $ 4,020 Retained Earnings
Balance, beginning of year
$ 29,203 $ 24,584 $ 20,564 Net income
2,050 4,619 4,020 Balance, end of year
$ 31,253 $ 29,203 $ 24,584 *475 UEC's financial records are generated annually. Therefore, information similar to that which is presented above and which concerned UEC's performance between January 1 and March 30, 1982, was not available on the date of decedent's death. From the preceding tables, it can be seen that UEC consolidated gross revenues increased, in relation to the immediately preceding year, by approximately 18.5% in 1980 and 11.7% in 1981. The principal factors to which such growth may be attributed are the acquisition of Action in 1980, and the growth in net investment income UEC experienced in 1980 and 1981. The decrease in the growth rate, i.e., an increase of only 11.7% in 1981 down from the 1980 increase of 18.5%, in large part reflects the problems UEC encountered with respect to its direct response marketing of accident and health policies and its warranty service contracts sales. As evident from the above tables, UEC's consolidated expenses also grew, in relation to the immediately preceding year, by approximately 18.3% in 1980 and 26.5% in 1981. The net result of the increases in revenues and the increase in expenses, in 1980 and 1981, is that, in relation to the preceding year, *476 net income rose by approximately 14.9% in 1980 and fell by approximately 55.6% in 1981. Overall, UEC's net profit margin was 10.5% in 1979, 10.2% in 1980, and 4.2% in 1981. The precipitous drop in UEC's net income and profit margin between 1980 and 1981 is attributable to a multitude of problems UEC encountered during that period. First, UEC was performing poorly in connection with its direct response marketing of the accident and health insurance lines. Second, UEC was suffering a very high lapse rate in connection with its life insurance sales which caused an accelerated amortization of those policies' acquisition costs. Third, UEC was required to make a large adjustment in 1981 to AWC's reserve for claims losses. Fourth, UEC's earnings were also impacted by the accruals UEC made for payment of the contingent consideration owed in connection with the acquisition of Action in 1980. Finally, UEC experienced, in 1981, a combination of a relatively low revenue gain and a narrowed profit margin caused by an inability to control salary and administrative expenses. Throughout 1979 and 1980, salary and administrative expenses grew in line with revenues. In 1981, however, such expenses *477 grew, in relation to 1980, by approximately 29.2% whereas revenue declined sharply. What is also evident from the above tables is that an additional source of earnings for UEC came from investment income, which primarily flows from assets underlying UEC's claims reserves. Such revenue grew, in relation to the preceding year, by 33.3% in 1980 and by 40.2% in 1981, approximately. This favorable investment income record reflects UEC's policy of investing in short and intermediate-term securities, i.e., securities with a life of one to four years, and reflects the benefits such policy reaped because of the record high interest rates prevailing in the 1979 to 1981 period. In early 1982, however, interest rates were falling and were expected to decline even further. The result caused by UEC's reliance upon such securities and by the declining interest rate, with respect to UEC's investment income trend, would be that the investments it held in early 1982 would roll off the corporate books and would be replaced with securities bearing a smaller yield. Thus, the expectations concerning future investment income, based on UEC's investment portfolio as it existed on the date of death, *478 were that such income source would be less successful than it had been in the recent past. Miscellaneous Factors Effecting Value of Stock Suit by former employee. When UEC acquired AWC, UEC entered into with AWC's then-existing management certain employment contracts which, inter alia, limited such management's ability to compete with UEC in the event they left that corporation's employ. In 1981, AWC's former president, Jerry R. Farrar (Farrar), was terminated from his position as president and chief operating officer of AWC. Following such termination, Farrar was employed by another insurance agency. As a result of such other employment, AWC sued, inter alios, Farrar and his employer at that time on the grounds that, as UEC asserted, Farrar was competing against AWC in violation of the above-mentioned employment contract. The relief UEC sought was primarily in the nature of an injunction under which Farrar would be prohibited from utilizing AWC's actuarial reports and dealer lists in competition with AWC. UEC also sought punitive damages of an unspecified amount. In response to the suit brought by AWC, Farrar and his employer at that time bought a cross-claim against *479 AWC and UEC which may be characterized as an anti-trust suit. Such cross-claim sought, inter alia, salary, bonuses, vacation and severance pay, and amounts due from Farrar's profit sharing plan, all as were allegedly due Farrar under the employment contract he had with UEC. In addition, Farrar also sought punitive damages against UEC. The relief sought by Farrar against UEC was in an amount of approximately $ 40,000,000. At the time of decedent's death, no resolution of the suit filed by UEC against Farrar, or of the cross-claim filed by Farrar against AWC and UEC had been reached. Management. UEC was founded by decedent in 1972. From its inception until the date of decedent's death, UEC has been a company highly dependent upon specialized marketing techniques which are employed in selected markets to encourage the sale of UEC's non-traditional insurance products and services. Throughout the company's history, decedent had been heavily involved in the daily operation of UEC. Decedent was the creative driving force behind both UEC's innovative marketing techniques, and UEC's creation of, or acquisition and exploitation of, new products and services. In 1981, decedent *480 was paid a salary of $ 270,000 by UEC and of $ 98,466 by AWC for his services. Such salary was, as compared to the salaries of the executives in positions and companies comparable to decedent's, approximately $ 100,000 higher than the norm. However, decedent never received any payments from UEC in the form of dividends. Despite the higher salary decedent received, UEC recognized that the prospects for finding someone to replace decedent as the head of UEC's management team were not hopeful. In recognition of UEC's probable inability to acquire the services of a competent leader to replace decedent, UEC attempted to partially ameliorate that eventuality by obtaining an insurance policy on decedent's life under which UEC was the beneficiary. Such insurance policy provided for proceeds of $ 2,000,000 upon decedent's death. Prior Sales of UEC Stock. Immediately following incorporation, UEC was operated as a privately held corporation. In March, 1973, UEC converted from private to public ownership through the sale of its common stock to the public on the over-the-counter market. UEC reverted to private ownership in September, 1976, following a tender offer at $ 6 per share *481 to public shareholders. The parties have stipulated that as of October 1, 1979, the fair market value of the common stock of UEC was $ 8 per share. In 1981, UEC purchased 367 shares of its common stock for $ 10 per share. Further in 1981, under the terms of a stock purchase plan, UEC sold 12,500 shares of its common stock from its treasury stock holdings to the then-existing president of UEC at a price of $ 10 per share. Testimony of Experts Petitioner's Expert. In an attempt to prove its asserted value of $ 10 per share, petitioner offered the testimony of Milton L. Meigs (Meigs), an investment and financial analyst engaged for the purpose of valuing the UEC corporation and, in particular, the stock in question. In the course of his examination, Meigs conducted an in-depth and thorough evaluation of UEC, its subsidiaries, the business conducted thereby, and the economic trends existing at the time of decedent's death. From such analysis, Meigs made a forecast concerning what could be expected by UEC in the form of future economic trends. Relying upon his analyses and forecasts, Meigs devised a valuation of UEC under a comparative market analysis approach. [5] The approach *482 Meigs used relied solely upon UEC's 1981 earnings figures as such figures were, Meigs felt, indicative of the earnings UEC could expect in the future. From his examination of five publicly traded companies he found to be comparable to UEC, Meigs found two quantitative factors to be of primary importance. First, Meigs determined that the price/earnings ratio [6] for the comparable companies' stock ranged, at the time of death, from 5.6:1 to 7.7:1. Second, Meigs considered the relationship that the market value of the stock traded on the market bore to the book value of the stock's corporation. From such determination, Meigs found that the market value *483 of the comparable corporation's stock was generally between 63% to 148% of that corporation's book value. After having made such determinations concerning the price/earnings ratios and the market to book value percentages of corporations comparable to UEC, Meigs then opined that UEC's stock was worth $ 10 per share as of the date of decedent's death. The value Meigs ascribed to UEC's stock is equivalent to approximately 4.7 times UEC's reported operating earnings and represents 32% of UEC's yearend 1981 book value. The value Meigs ultimately reached with respect to UEC's stock did not comport with the numbers at which he arrived in analyzing the corporations comparable to UEC because Meigs considered two qualitative factors which did not avail themselves to the application of strict formulae. First, Meigs concluded that UEC's value should be lower than that value which would be reached using the quantitative factors of the comparable companies because there was a "serious management vacuum" created by the death of decedent. From this, Meigs vaticinated that UEC's *484 earnings would be negatively impacted in the future. Second, Meigs reasoned that UEC's value should be even lower still, as such related to the comparable companies, because the pending litigation brought by Farar would cast a cloud on UEC's attractiveness to any potential investor. As further support for the $ 10 per share value he ascribed to UEC's stock, Meigs referred to the price/earnings ratios and the market to book value percentages UEC's stock experienced while it was being publicly traded during the period 1973 through 1976. [7] The market conditions for that period for stocks generally, and insurance stocks specifically, were, on the average, not materially dissimilar to the market conditions of early 1982. Because of this, Meigs concluded that his ascribed $ 10 per share value was the fair market value of UEC's stock as of the date of decedent's death. *485 Respondent's experts. Respondent first offered the testimony of Robert v. McMahon (McMahon), an independent contractor associated with a national business brokerage firm, for the purpose of valuing UEC. For his valuation, McMahon relied almost exclusively upon UEC's financial records from 1976 through 1981. However, such records did not include UEC's Federal income tax returns for those years. At no time did McMahon interview any of the management personnel surviving decedent. In the course of his valuation, McMahon employed an approach based upon an investor's anticipated return on investment. Further, the analysis McMahon used is based upon projections he made concerning UEC's future earnings, rather than upon UEC's past earnings experience. To calculate a projection of UEC's net income for the years 1982 through 1988, McMahon first looked to UEC's performance during 1977 through 1981 and determined: (1) that UEC had an average annual increase in total income of 21.5%; (2) that net income as a percent of assets was an average of 5.6%; and, (3) that assets increased an average of 9.2% annually. McMahon next used UEC's data from 1977 through 1981 to determine that *486 UEC had: (1) An average total income of $ 36,500,000; (2) An average net income of $ 3,700,000; and, (3) Average asset holdings of $ 67,300,000. By using the average total income and average asset holdings, and by applying them to the average percentage increases listed above, McMahon calculated UEC's net income for each year from 1982 through 1988. Finally, by taking one more average, the average of his projected annual net incomes, McMahon concluded that UEC would realize, for years after 1981, average annual net income of $ 6,900,000. McMahon reached this conclusion despite having observed that UEC's profitability between 1977 and 1981 was in decline. McMahon next computed the return an average investor would require on investments in UEC as of December 31, 1981. To make such a computation, McMahon considered the yield on 10 years United States Treasury Notes, which was 13% as of such date, and added an additional 2% for the inherent risk, and for the lack of liquidity an investor would face with an investment in UEC. Thus, McMahon concluded that an average investor would require a 15% rate of return on investments in UEC as of December 31, 1981. McMahon took the average *487 projected annual earnings, $ 6,900,000, and divided that by the rate of return an investor would require, 15%, to compute the investment which would be required to return $ 6,900,000 at 15%. Such investment equaled $ 46,000,000. From this number, McMahon subtracted the difference between the liabilities owed by UEC, and the cash and equivalents UEC retained, both as of December 31, 1981. The result of $ 46,000,000 less the $ 2,633,000 differences of liabilities over liquid assets is $ 43,367,000. This figure is McMahon's estimate of the fair market value of UEC as of December 31, 1981. McMahon further stated that this value would prevail as of the date of decedent's death. To arrive at the value of the stock held by decedent at the date of his death, as such related to the value of the corporation as a whole on such date, McMahon next concluded that the shares held by decedent, 767,800 shares, were not in fact the 79.5% of UEC's outstanding stock which such shares represented. That is, through a convoluted weighting formula for which he offered no explanation, McMahon concluded that, in reality, the 767,800 shares decedent held were equivalent to 82.48% of UEC's total shares *488 outstanding. This is tantamount to applying a premium to decedent's holdings for the reason that an investor would be acquiring control of UEC when such investor bought decedent's shares in UEC. Thus, McMahon concluded that the 767,800 shares decedent held at the time of his death should be valued at 82.48% of the total value of UEC, i.e., that decedent's holdings had a fair market date of death value of $ 35,776,524, or a value of $ 46.60 per share. Respodent next offered the testimony of Steven R. LaMantia (LaMantia), a professional appraiser engaged by respondent for purposes of valuing decedent's holdings in UEC as of the date of decedent's death. In the report prepared in connection with such valuation, following a brief description of the lines of business in which UEC was engaged, LaMantia performed a comparative market analysis similar to, but distinct from, that analysis which was conducted by Meigs. From an examination of nine corporations he found to be comparable to UEC, LaMantia determined that a value for UEC could be determined by applying a capitalization rate of 6.5, i.e., a price/earnings ratio of 6.5:1, to UEC's net income. LaMantia first applied such rate *489 to only UEC's net income. LaMantia first applied such rate to only UEC's 1981 net income and arrived at a value of $ 13,325,000. Next, LaMantia applied the capitalization rate of 6.5 to an average of UEC's net income from the preceding five years, 1977 through 1981, to arrive at an alternative value of $ 23,106,200. Because LaMantia felt UEC's 1981 earnings were being skewed by losses incurred by Action, LaMantia focused upon the value achieved by the capitalization of UEC's average earnings from the preceding five year period. Lamantia's analysis operated under the impression that Action had incurred losses in 1981 of approximately $ 1,500,000. In fact, Action's 1981 losses were only $ 100,000. Despite his focus on the value derived from capitalization of the five-year average of UEC's earnings, LaMantia did determine that UEC's lowered earnings in 1981 indicated that UEC would continue to realize decreased earnings in the future. For this reason, LaMantia discounted the value he reached for the whole of UEC of $ 23,106,200 to $ 20,000,000. Such value for UEC reflects a price per share of $ 20.72. To the $ 20.72 per share indicated value, LaMantia then applied a premium *490 of 20% in recognition of a premium the average investor would pay when purchasing a controlling share of a corporation's stock. Thus, the value LaMantia attributed to decedent's holdings, 767,800 shares, at the death of death is, rounded to the nearest million, $ 19,000,000, or $ 24.75 per share. Notice of Deficiency
Petitioner listed the value of decedent's UEC's holdings at $ 10 per share in the estate tax return petitioner filed. In his notice of deficiency, respondent determined that the fair market value of such UEC stock in the estate of decedent should be $ 46.60 per share, in reliance upon McMahon's appraisal. OPINION The sole issue for decision is the date of death value of 767,800 shares of UEC common stock owned by decedent at his death. Section 2031(a) [6] requires that the property be included in a decedent's gross estate shall be taxed on the basis of that property's fair market value at the time of the decedent's death. Section 20.2031-1(b) of the Estate Tax Regulations defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both *491 having reasonable knowledge of relevant facts." With respect to stock or securities of a corporation, where such are traded on a national stock exchange, the value of those stocks or securities is easily determined by reference to the relevant market price thereof. Where the corporate stocks or securities are not listed on an exchange but are closely held, however, the proper method of valuation is made "by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." Sec. 2031(b). Unfortunately, such a method of valuation may be reduced to the application of rote formulae. See . Clearly the question here presented is purely one of fact which is better disposed of through settlement negotiations between the parties, rather than through an adjudication *492 process which put the onus upon us to make a Solomon-like pronouncement. See . In looking at the surrounding facts and circumstances, we are limited to those which were available on the date of decedent's death; using hindsight at the time of trial would be inappropriate. . When the date of death is the valuation date, post-mortem events may be considered, however, for the limited purpose of establishing that the willing buyer and seller's expectations were on the valuation date and whether these expectations were reasonable and intelligent. Further, in determining the buyer and seller's expectations, events occurring after decedent's death are considered only if such events were reasonably foreseeable at that time. . That is, reasonable expectations entertained at the date of death are of substantial importance; "subsequent events may serve to establish both that the expectations were entertained and *493 also that such expectations were reasonable and intelligent." . The question of the fair market value to be attributed UEC's stock is a question of fact. Petitioner bears the burden of proof in showing that the value determined by respondent is incorrect. . As the triers of fact, we are required to weigh all relevant evidence and draw appropriate inferences therefrom. . Included within the ambit of relevant evidence are the valuations made by the parties' respective experts. After reviewing the valuation methods adopted by the parties' experts, we are not satisfied that any one method, or the result reached thereby, should be adopted by us in toto. Meigs' report does provide a comprehensive review of UEC and its major lines of business. However, it appears that Meigs merely chose a value of $ 10 per share and then attempted to justify that value by referring to the sales of UEC stock occurring between the remote period of 1973 and 1976 when UEC's stock was publicly traded. Further, *494 although Meigs did do a comparative market analysis, the valuation he ascribes to the stock in question in no way comports with such analysis. For example, although Meigs found that comparative market price/earnings ratios ranged from 5.6:1 to 7.7:1, Meigs' value is equivalent to a price/earnings ratio of 4.7:1. McMahon's method of valuation is even less supported by the facts. Initially, we observe that McMahon relied upon market numbers generated in the abstract by Forbes magazine. Further, in applying the numbers so generated, McMahon is caught in the trappings presented by the application of rote formulae. That is, as is apparent from the method by which he arrives at an average annual net income, McMahon is enticed into a false sense of security in his numbers merely because they are averages. With respect to the use of averages, it has been said: averages may be deceiving. Two corporations with 5-year earnings going from the past to the present represented by the figures in one case of 5, 4, 3, 2, and 1, and in the other by the same figures of 1, 2, 3, 4, and 5, will have the same 5-year averages, but investors will quite naturally prefer the stock of the later whose *495 earnings are consistently moving forward.
. Finally, LaMantia's method of valuation ignores the significant problems UEC faced with respect to its claims reserve, and further ignores the effect a declining interest rate would have upon UEC's future investment portfolio's income. Further, LaMantia too relied upon a five-year average earnings figure although he did observe that UEC's 1981 earnings had dropped substantially. These are not all of the shortcomings we found in each method of valuation but they are principal reasons why we will not adopt in whole the report of any one expert, nor will we weigh the reports one against the other to arrive at a value for the decedent's UEC stock. Rather, we have evaluated UEC's financial history using the experts' reports as a reference and have arrived at a value for such stock using a different methodology. From our review of the facts concerning UEC and its family of companies, as such facts existed on the date of decedent's death, we find that UEC was suffering from a serious decline in its profitability without much hope for a recovery in the *496 near future. UEC's sales of accident and health insurance through direct response marketing, its historical marketing mainstay, were progressively decreasing. UEC's life insurance sales, although increasing in volume, were facing an ever increasing lapse rate with the result that the policy acquisition costs incurred in connection with the increased sales were necessarily being expensed at a faster rate. UEC's warranty services, its major source of revenue in 1981, were suffering from a decline in related automobile sales, increased competition from automobile manufacturers, and disruptions in its marketing program, all of which resulted in decreased sales. Further, UEC's warranty services insurance coverage was, as of 1981, found to be backed by reserves which were found to be dangerously insufficient to meet future warranty claims. Finally, UEC's investment portfolio income, which was highly dependent upon intermediate and short-term securities, was sure to decrease as such securities rolled off of UEC's books and were replaced with securities which would bear lower interest rates because such rates were on the decline in 1981. All of these factors reflect that UEC's future *497 would not bode well to a potential investor. Taking into consideration UEC's past economic performance and future economic prospects, we find that the stock in UEC held by petitioner should be valued by use of a comparative market analysis. Under such method of valuation we shall first derive a per share value based upon the following: (1) The price/earnings ratios of corporations comparable to UEC; (2) The relationship the market price of comparable corporations' stock bore to the book value of their respective corporations; and, (3) The value ascribed to UEC's stock when such was previously sold.
After arriving at a value per share of UEC's stock using the above three methods, we shall derive a weighted average price per share based upon the relative trustworthiness of those three methods. Price/Earnings ratios. To establish a value for the UEC stock in question by using the price/earnings ratios of comparable corporations, it is first necessary that we establish an earnings base to which the ratio will be applied. In calculating such earnings base, we rely only upon that information which would have been available to an investor on the date of decedent's death. *498 For this reason, we do not look to UEC's 1982 financial records because such would not have been generated until after the valuation date. We have chosen to consider the earnings UEC experienced during 1979, 1980, and 1981. We do so because, in recognition of UEC's relative success in the past, the earnings for 1979 and 1980 would have some importance to an investor in UEC at the time of valuation. The earnings from those two years would not be given the same weight of importance as would the earnings from 1981, however. For this reason we shall weight UEC's earnings for 1980 as being more important than those for 1979. Further, because all three experts offered by the parties found 1981's earnings to be on the decline and, more importantly, indicative of the earning UEC could expect in the future, we have chosen to weight that year's earnings as being of primary importance. Therefore, our earnings base is calculated as follows (in 000's): Weight
Weighted
Year
Earnings
Factor
Earnings
1981
2,050 x
.7 =
1,435.0
1980
4,619 x
.2 =
923.8
1979
4,020 x
.1 =
402.0
Earnings base
$ 2,760.8
Generally, it would be appropriate to adjust *499 UEC's past earnings to take into consideration items which are non-recurring and extra-ordinary in nature, and which have the tendency to distort UEC's prior earnings. Respondent argues that the adjustments UEC made to its claim reserve, and that the costs AWC incurred in revamping its computer system, should be so characterized, and that UEC's 1981 earnings should, therefore, be adjusted. In the realm of economic reality, we find that the increase to UEC's claims reserve is neither extraordinary, nor nonrecurring. As an on-going business, UEC is required to continually and accurately evaluate the estimations it makes with respect to its claim reserves. Such is the nature of the insurance industry that it must constantly make estimates despite the uncertainties it faces, and that it must continually make adjustments to such estimates as the operative facts of such estimate change. The claim reserves account is such an estimate and the increase UEC made thereto in 1981 is such an adjustment. Further, that such an adjustment could be expected to again occur in the future is shown by UEC's actuary advising UEC to anticipate *500 additional modifications to that account. With respect to the revamping of AWC's computer system, we also find such to neither be nonrecurring, nor extraordinary. UEC, as is the whole insurance industry, is heavily dependent upon computers in the conduct of its business. For this reason, in the case at hand we find that AWC's modification of its computer system was an ordinary and necessary expense, and that such expense can reasonably be expected to be incurred in the future. To their respective earnings bases, Meigs applied a capitalization rate of 4.7, i.e., a price/earnings ratio of 4.7:1, and LaMantia applied a rate of 6.5. Because of the claim reservers problems UEC was facing in 1981, because of the drastic decrease in profitability UEC saw in that year, and because UEC's investment portfolio promised to see reduced income in the future, we find that the proper capitalization rate should be at the lower end of the spectrum presented by the parties' experts; we will apply a price/earnings capitalization rate of 5: (Earnings Base) (in 000's) x (Capitalization rate) = Aggregate Value of UEC (in 000's) $ 2,760.8 x 5 = $ 13,804
The aggregate value of UEC, therefore, yields *501 a per share value of $ 14.30 as of December 31, 1981 using the price/earnings ratio method. Book value. The book value of a corporation indicates how much of that corporation's net assets, valued as a going concern, stand behind each share of its stock. See Such value is, therefore, an important factor in valuing the shares in question. UEC's book value as of December 31, 1981, was $ 30,368,000. Included within this value is the life insurance policy UEC held on decedent's life. The value of said policy, as included within UEC's book value on December 31, 1981, is not the amount UEC would receive on decedent's death; rather, it is the amount UEC paid for the acquisition of the policy. To accont for the $ 2,000,000 in proceeds UEC would receive from the policy, we find that it would be appropriate to include that amount within the book value when computing a market to book value for UEC's stock. Therefore, for our purposes, the book value of UEC will be $ 32,368,000. This amount includes the amount UEC paid for the policy; however, we cannot take such policy cost into consideration because that cost is not in the *502 record. In his examination of UEC, Meigs found that the price of a stock, as a percentage of that stock's book value, ranged from 63% to 148%. LaMantia found such percentages to range from 50% to 220%. As of December 31, 1981, the asset "deferred policy acquisition costs" represented 24.8% of total assets. At that time there existed considerable risk that such asset was substantially overstated and subject to an accelerated rate of amortization if UEC's lapse experience also deteriorated. Considering this, and considering the increases UEC was experiencing in its lapse rates, we find that a proper value for the aggregate of UEC's outstanding stock will be found by applying a book-to-market value percentage of 45%. Accordingly, the aggregate value of UEC stock outstanding is: $ 32,368,000 x .45 = $ 14,565,600
Such value represents $ 15.09 per share as of December 31, 1981. Prior sales. The prior sales here under consideration are those sales which involvved a material number of shares, and which occurred at the time that UEC converted from public to private ownership or thereafter. Such sales were as follows: Year
Price
1976
$ 6
1979
8
1981
10
*503 We find that such history of shares sold is relevant to our present inquiry for two reasons. First, that the prices at which the stock sold over the years increases in line with the overall growth of UEC reflects that such prices do indicate the stock's relative fair market value on those dates. Second, the prior sales are relevant because of the close proximity in time the most recent of such sales bears to the valuation date. For our purposes, we shall rely only on the sales of stock occurring in 1981. Such sale was of 12,500 shares made to the then-existing president of UEC under the terms of a stock purchase plan. Because such sale involved a relatively small number of shares of stock and was made to an officer of UEC under a stock purchase plan, however, we find that it would be appropriate to apply a premium to the sales price to determine the stock's true fair market value. Such premium shall be one of 30% as of December 31, 1981. Accordingly, we find that the fair market value of UEC's stock as of December 31, 1981, based on the prior sales experience of such stock, is $ 13 per share. Per Share Weighted Average Value
To reach a per share value of UEC's stock *504 as of December 31, 1981, we shall use a weighted average of the results reached under the above three approaches. Of least value is the price determined from an examination of the prior sales. The results reached from use of the price/earnings method is of most importance because the earnings of UEC are more indicative of what can be expected following decedent's death than is the book value of the stock. Accordingly, we weight the results reached above as follows: Weighted
Method
Result Reached
Weight Factor
Value
Price/earnings
$ 14.30
.6
$  8.58
Book value
15.09
.3
4.53
Prior sales
13.00
.1
1.30
Per share weighted average value
$ 14.41
Adjustments. The per share weighted average fair market value of $ 14.41 is computed above based upon December 31, 1981 information. We find that additional adjustments to such value are required by the facts of this case. Initially, we recognize that an investor would be willing to pay a premium above fair market value for a block of shares which represent a controlling interest in UEC (control premium). See . The *505 shares held by decedent at the date of death represent such a controlling interest and a control premium should, therefore, be applied. We further recognize, however, that where a corporation is substantially dependent upon the services of one person, and where that person is no longer able to perform services for the corporation by reason of death or incapacitation, an investor would expect some form of discount below fair market value when purchasing stock in the corporation to compensate for the loss of that key employee (key employee discount). See (1976: Edwards v. Commissioner, a Memorandum Opinion of this Court dated January 23, 1945. We find that Milton Feldmar was an innovative driving force upon which UEC was substantially dependent for the implementation of new marketing strategies and acquisition policies. Therefore, we find that a key employee discount is appropriate. Respondent asserts that no key man discount should be applied becuase, respondent argues, any detriment UEC suffered from the loss of decedent's services is more than compensated for by the life insurance policy upon decedent's life. *506 We do not find merit in such a position. The life insurance proceeds UEC was to receive upon decedent's death are more appropriately considered as a non-operating asset of UEC. See We did this when we determined a value of UEC's stock by using the market-to-book valuation method. Respondent also argues that the key employee discont should not be applied because, respondent asserts, UEC could rely upon the services of the management structure already controlling UEC, or UEC could obtain the services of a new manager, comparable to the decedent, by using the salary decedent had received at the time of his demise. With respect to the existing management, Meigs conducted interviews of such managers and found them to be inexperienced and incapable of filling the void created by decedent's absence. By contrast, neither of respondent's experts offered an opinion on such management's ability to replace decedent. From the evidence presented, we conclude that UEC could not compensate for the loss of decedent by drawing upon its management reserves as such existed on the valuation date. Taking into account the control premium *507 and key employee discount, we find that an investor would be willing to pay a 15% premium for a controlling block of shares in UEC, but the same invfstor would expect a 35% discount for the loss of a key employee. A control premium of 15% is proper in the case at hand because, although an investor would be acquiring a corporation over which he could exercise dominion, that investor would also be acquiring a corporation which was already facing declining profitability and serious concerns regarding the adequacy of its claims reservs. A key man discount of 35% is appropriate in this case because UEC suffered a serious loss when decedent took to his grave his considerable expertise in finding and expoloiting innovative insurance products and services. Such 35% discount should be reduced, however, to account for UEC's potential for finding a new leader, from outside of its existing management, to replace decedent. Although we find it to be a very remote possibility that UEC might find a new helmsman with knowledge, experience, innovative skills, and resources comparable to those of the decedent, we shall reduce the key employee discount to be applied forrm 35% to 25% to account for such *508 potentiality. Combining the control premium of 15% and the key employee discont of 25%, the result is an overall downward adjustment of 10% to the per share weighted average fair market value of $ 14.41. Accordingly, the per share fair market value of UEC's stock on December 31, 1981, is computed: $ 14.41 - $ 1.44 = $ 12.97 This value, $ 12.97 per share, must now be adjusted to take into consideration two other variables. First, the value determined above must be adjusted to account for the potential loss UEC might face in connection with the anti-trust suit brought by Farrar. We find that such suit would, in an investor's mind, cast a cloud upon UEC's financial stability, and that such investor would take such into consideration when determining what price to pay for the stock. Further, the value determined above must be adjusted so as to bring that value up to the date of decedent's death; the value above determined is as of December 31, 1981, and the proper valuation date is March 30, 1982. To account for such difference in valuation dates, we find that UEC could expect to experience the same decline in profitability and could expect the same lessening of its revenues *509 in the first 90 days of 1982 as it experienced in 1981. To give due consideration to the concerns presented by the suit facing UEC, and to account for the decreases in value UEC's stock would suffer between December 31, 1981, and March 30, 1982, we find it to be appropriate to decrese the above-determined value by an additional 4%, which is equivalent to a per share discount of $ 0.52 to arrive at a date of death fair market value of $ 12.45 per share. Accordingly, the date of death value of 767,800 shares of United Equitable Corporation common stock owned by the decedent at his death is $ 9,559,110. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. UEC's direct response marketing new policy premium income was as follows: ↩
New
Add-On Sales
Total New
Policy
To Existing
Policy
Year
Premiums
Change
Policy holders
Premiums
Change
1978
1,628,000
N/A
1,628,000
1979
1,375,000
1,422,000
2,797,000
(35.8%)
1980
1,004,000
791,000
1,795,000
(84.9%)
(46.6%)
1981
152,000
806,000
958,000
2. This is based upon statutory accounting procedures, as opposed to generally accepted accounting principles. ↩
3. As an example of how the loss ratio is computed, in 1981, the loss ratio represents the UEIC paid out 78.6 cents of every dollar it received in premiums. Such ratio is based upon information generated under statutory accounting procedures, as opposed to generally accepted accounting principles. ↩
4. The consolidated financial statements of UEC were prepared in conformity with generally accepted accounting principles which, as to UEC's insurance subsidiaries, vary in some respects from statutory accounting practices which are prescribed by such subsidiaries' respective domiciliary states' insurance department. ↩
5. Such approach entails an examination of corporations which are publicly traded, and which are comparable to the corporation under examination. From the examination of the comparable corporations, an appraiser is able to ascertain a number of quantitative factors which are then applied to the information of the corporation whose value is being determined. Theoretically, the application of such quantitative factors to the information concerning the corporation under examination will yield estimates of that corporation's value. ↩
6. Such ratio shows the relationship a stock's price bears to the earnings that stock's corporation realizes. ↩
7. The market statistics of UEC's common stock as it was publicly traded during 1973 through 1976 appear as follows: ↩
Price earnings ratio
Market % of book value
Year
Low
High
Low
High
1973
2.3
9.9
39%
163%
1974
1.0
4.0
12 49 1975
1.1
3.7
11 38 1976
1.7
3.4
23 46 6. All section references are to the Internal Revenue Code of 1954, as amended and in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. ↩